ACCEPTED
12-15-00141-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
7/24/2015 2:19:04 PM
CATHY LUSK
CLERK

NO. 12-15-00141-CV

**IN THE
TWELFTH COURT OF APPEALS
TYLER, TEXAS**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
7/24/2015 2:19:04 PM
CATHY S. LUSK
Clerk

_____

MORRISON SUPPLY COMPANY, LLC, ET AL.     APPELLANTS

V.

SCOTT HILBURN, ET AL.     APPELLEES

_____

## BRIEF OF APPELLEES

_____

Keith Dollahite
State Bar No. 05958550
M. Keith Dollahite, P.C.
5457 Donnybrook Avenue
Tyler, Texas 75703
(903) 581-2110
(903) 581-2113 (Facsimile)
keith@mkdlaw.us

Trey Yarbrough
State Bar No. 22133500
Dallas W. Tharpe
State Bar No. 24052036
Yarbrough Wilcox, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
(903) 595-3111
trey@yw-lawfirm.com
dallas@yw-lawfirm.com

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

| Appellants / Defendants | Attorneys |
|---|---|
| Morrison Supply Company, LLC<br>Patriot Supply Holdings, Inc. | Vanessa Griffith<br>State Bar No. 00790469<br>Stephen S. Gilstrap<br>State Bar No. 24078563<br>Vinson & Elkins, LLP<br>2001 Ross Avenue, Suite 3700<br>Dallas, Texas 75201<br>(214) 220-7713<br>vgriffith@velaw.com<br>sgilstrap@velaw.com<br><br>Michael E. Starr<br>State Bar No. 19078400<br>Coghlan Crowson LLP<br>P.O. Box 2665<br>Longview, Texas 75606<br>(903) 758-5543<br>mstarr@ccfww.com |

| Appellees/ Plaintiffs | Attorney |
|---|---|
| Mike Anthony<br>Scott Hilburn | Keith Dollahite<br>State Bar No. 05958550<br>M. Keith Dollahite, P.C.<br>5457 Donnybrook Avenue<br>Tyler, Texas 75703<br>(903) 581-2110<br>(903) 581-2113  (Facsimile)<br>keith@mkdlaw.us<br><br>Trey Yarbrough<br>State Bar No. 22133500<br>Dallas W. Tharpe<br>State Bar No. 24052036<br>Yarbrough Wilcox, PLLC<br>100 East Ferguson, Suite 1015<br>Tyler, Texas 75702<br>(903) 595-3111<br>trey@yw-lawfirm.com<br>dallas@yw-lawfirm.com |

# TABLE OF CONTENTS

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Standard and Scope of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Objection to Morrison's Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1.      Anthony and Hilburn began their work careers with American Supply. . . . 4

2.      Eighteen years later, Morrison acquired American Supply. . . . . . . . . . . . . . 4

3.      Fifteen years later, Patriot acquired Morrison. . . . . . . . . . . . . . . . . . . . . . . 5

4.      Morrison's East Texas employees quickly became dissatisfied with Patriot's new approach to doing business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5.      In 2011, the Supreme Court changed the rules for non-compete agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6.      A year after the *Marsh* decision, Morrison's top executives asked Anthony and Hilburn to sign a stock option agreement containing a non-compete provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7.      About two years after the Rockwall meeting, Anthony and Hilburn talked to the owner of National about going to work for National. . . . . . . . . . . . . . . 12

8.      On April 13, 2015, Anthony, Hilburn, and other employees resigned from Morrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9.      National opened up branch locations in East Texas and Shreveport. . . . . . 13

10.    Anthony and Hilburn were not working for National. . . . . . . . . . . . . . . . 14

11.    The trial court denied Morrison's application for a temporary injunction.. 15

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.    Morrison failed to properly challenge the trial court's ruling in its brief. . 18

       A.    In the absence of findings of fact, the Court must uphold the trial court's order on any legal theory supported by the record.. . . . . . . . . . . . . . 18

       B.    Morrison did not request – and the trial court did not make – findings of fact and conclusions of law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       C.    The Court should affirm because in its brief, Morrison did not challenge every implied finding that could support the trial court's order. . . . 23

II.   Morrison was required to prove four elements to obtain a temporary injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.  Morrison did not prove at least one element of its cause of action against Anthony and Hilburn for breach of the stock option agreement. . . . . . . . . 26

       A.    Morrison did not prove the existence of a valid contract.. . . . . . . . 26

              1.    Consideration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

              2.    Reasonable Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       B.    Alternatively, Morrison did not prove that it performed or tendered performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       C.    Alternatively, Morrison did not prove that Anthony and Hilburn breached the agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D.    Alternatively, Morrison did not prove that Anthony and Hilburn caused damages to Morrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.    Alternatively, some evidence supports one or more of Anthony and Hilburn's defenses to Morrison's contract claim. . . . . . . . . . . . . . . . 37

IV.  Morrison did not prove it had a probable right to the relief it requested. . . 38

V.   Morrison did not prove it will suffer a probable, imminent, and irreparable injury without a temporary injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VI.  Morrison did not prove that a balancing of the equities entitles it to equitable relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VII.  Morrison's complaint about reformation of the non-compete is without merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.    The Court does not have jurisdiction to consider this complaint. . . 43

B.    Alternatively, Morrison does not have a common law or statutory right to reformation before a trial on the merits. . . . . . . . . . . . . . . . . . . . . 45

C.    Alternatively, Morrison's request for reformation was itself unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

D.    Alternatively, Morrison cannot obtain a temporary injunction to enforce a reformed non-compete without establishing the grounds for a temporary injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# INDEX OF AUTHORITIES

Cases

*Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.*, 260 S.W.3d 529 (Tex. App. – Tyler 2008, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 35, 36

*Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877 (Tex. App. – Dallas 2009, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006) (Chief Justice Jefferson, joined by Justice O'Neill and Justice Medina, concurring) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Anderson Chem. Co. v. Green*, 66 S.W.3d 434 (Tex. App. – Amarillo 2001, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789 (Tex. 2002).  15, 20, 23

*Burgess v. Denton Cnty.*, 359 S.W.3d 351 (Tex. App.– Fort Worth 2012, no pet)  22

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002). . . . . . . . . . . . . . . 2, *et seq.*

*Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230 (Tex. App. – Houston [1st Dist.] 2003, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377 (Tex. 1987). . . . . . . . . . . 45

*Cherokee Water Co. v. Gregg Cnty. Appraisal Dist.*, 801 S.W.2d 872 (Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Davis v. Huey*, 571 S.W.2d 859 (Tex. 1978). . . . . . . . . . . . . . . . . . . . . . . 2, *et seq.*

*Digital Generation, Inc. v. Boring,* 2012 WL 1413386 (N.D. Tex. 2012).. . .  27-28

*Edmonds v. Gray*, 2008 WL 541673 (Tex. App. – Tyler 2008, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

*EMS USA, Inc. v. Shary*, 309 S.W.3d 653 (Tex. App.– Houston [14th Dist.] 2010, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

*Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246 (Tex.1983). . . 39

*Gooch v. American Sling Co.*, 902 S.W.2d 181 (Tex. App. – Fort Worth 1995, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Gray Wireline Serv., Inc. v. Cavanna*, 374 S.W.3d 464 (Tex. App. – Waco 2011, no pet.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Haase v. Glazner*, 62 S.W.3d 795 (Tex.2001). . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Haq v. America's Favorite Chicken Co.*, 921 S.W.2d 728 (Tex. App. – Corpus Christi 1996, writ dism'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Holt v. Kelso*, 2014 WL 858345 (Tex. App. – Austin 214, no pet.).. . . . . . . . . . 22

*In re Estate of Miller*, 446 S.W.3d 445 (Tex. App. – Tyler 2014, no pet.). . . 22-23

*In re Guardianship of Humphrey*, 2008 WL 2445503 (Tex. App. – Tyler 2008, pet. denied) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

*In re Poly-America, L.P.*, 262 S.W.3d 337 (Tex.2008).. . . . . . . . . . . . . . . . . . . 38

*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003) . . . . . . . . . . . . . . 32

*James v. Easton*, 368 S.W.3d 799 (Tex. App. – Houston [14th Dist.] 2012, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Johnson & Higgins v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex.1998).. . . . . 38

*LasikPlus of Texas, P.C. v. Mattioli*, 418 S.W.3d 210 (Tex. App. – Houston [14th Dist.] 2013, no pet.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 46

*Layton v. Ball*, 396 S.W.3d 747 (Tex. App. – Tyler 2013, no pet.). . . . . . . 2, *et seq.*

vii

*Lightning Oil Company v. Anadarko E & P Onshore, LLC*, 2014 WL 5463956 (Tex. App.– San Antonio 2014, pet. filed) (not released for publication).. . . . . . 20

*Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011). . . . . . . . . . . . . . . . 6, *et seq.*

*McGlothlin v. Kliebert*, 672 S.W.2d 231 (Tex. 1984). . . . . . . . . . . . . . . . . . 39-40

*McNeilus Companies, Inc. v. Sams*, 971 S.W.2d 507 (Tex. App. – Dallas 1997, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Moore v. Jet Stream Investments, Ltd.*, 315 S.W.3d 195 (Tex. App. – Texarkana 2010, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*NMTC Corp. v. Conarroe*, 99 S.W.3d 865 (Tex. App. - Beaumont 2003, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Okoro v. Cardenas*, 2013 WL 4820738 (Tex. App. – Austin 2013, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Olney Sav. & Loan Ass'n v. Farmers Mkt. of Odessa, Inc.*, 764 S.W.2d 869 (Tex. App. – El Paso 1989, writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Perry Homes v. Cull*, 258 S.W.3d 580 (Tex. 2008). . . . . . . . . . . . . . . . . . . . 24-25

*Posey v. Monier Res., Inc.*, 768 S.W.2d 915 (Tex. App. – San Antonio 1989, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Protect Environmental Services, Inc. v. Norco Corp.*, 403 S.W.3d 532 (Tex. App. – El Paso 2013, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sadler Clinic Ass'n, P.A. v. Hart*, 2010 WL 114241 (Tex. App. – Beaumont 2010, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . 44, 45-46

*Sec. Telecom Corp. v. Meziere*, 1996 WL 87212 (Tex. App. – Dallas 1996, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Sentinel Integrity Solutions, Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911 (Tex. App. – Houston [1st Dist.] 2013), pet. denied).. . . . . . . . . . . . . . . . . . . . . . . . . 47

*Sills v. Excel Servs., Inc.*, 617 S.W.2d 280 (Tex. Civ. App. – Tyler 1981, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, *et seq.*

*State v. Elite Med, L.L.C.*, 2011 WL 3610414 (Tex. App. – San Antonio 2011, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Stone v. Griffin Comm. & Security Systems, Inc.*, 53 S.W.3d 687 (Tex. App. – Tyler 2001, no pet.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Summers v. Fort Crockett Hotel, Ltd.*, 902 S.W.2d 20 (Tex. App. – Houston [1st Dist.] 1995, writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*, 375 S.W.3d 464 (Tex. App. – Austin 2012, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877 (Tex. App. – Dallas 2003, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *et seq.*

*TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742 (S.D. Tex. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Tranter, Inc. v. Liss*, 2014 WL 1257278 (Tex. App. Fort Worth 2014, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

*W.R. Grace & Co. - Conn v. Taylor*, 2007 WL 1438544 (Tex. App. [Houston 14th Dist.] 2007, no pet.) (not released for publication). . . . . . . . . . . . . . . 30-31

*Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950 (Tex. 1960) . . . . . . 34, 42

*Woods v. Communities in Sch. Se. Texas*, 2015 WL 2414260 (Tex. App. – Beaumont 2015, no pet.) (not released for publication). . . . . . . . . . . . . . . . . . . . 22

*Wright v. First Nat. Bank of Bastrop*, 2013 WL 1748741 (Tex. App. – Austin 2013, no pet.) (not released for publication).. . . . . . . . . . . . . . . . . . . . . . . 20

*Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289 (Tex. App. – Beaumont 2004, no pet.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-49

*Zodiac Corp. v. Gen. Elec. Credit Corp.*, 566 S.W.2d 341 (Tex. Civ. App. – Tyler 1978, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## Statutes

TEX. BUS. & COM. CODE § 15.50. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 27, 33

TEX. BUS. & COM. CODE § 15.51, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

TEX. CIV. PRAC. & REM. CODE § 51.014.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## Rules

TEX. R. APP. P. 28(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. R. APP. P. 38.1(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. R. APP. P. 9.4(i)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

TEX. R. CIV. P. 296-299a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Other

*Texas Rules of Appellate Procedure*, 60 TEX. B.J. 411 (1997).. . . . . . . . . . . . . . . 19

# ISSUES PRESENTED

1.    Did Morrison fail to properly challenge the trial court's ruling in its brief?

2.    Did Morrison prove each element of its cause of action against Anthony and Hilburn for breach of the stock option agreement?

3.    Did Morrison prove it had a probable right to the relief it requested?

4.    Did Morrison prove it will suffer a probable, imminent, and irreparable injury without a temporary injunction?

5.    Did Morrison prove that a balancing of the equities entitles it to equitable relief?

6.    Does Morrison's complaint about reformation of the non-compete have merit?

## STANDARD AND SCOPE OF REVIEW

"Appellate review of an order granting or denying a temporary injunction is strictly limited to [a] determination of whether there has been a clear abuse of discretion by the trial court in granting or denying the interlocutory order." *Davis v. Huey*, 571 S.W.2d 859, 861-62 (Tex. 1978).[1] "The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Layton v. Ball*, 396 S.W.3d 747, 753-754 (Tex. App. – Tyler 2013, no pet.). "In reviewing an order granting or denying a temporary injunction, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment." *Id.* "A trial court does not abuse its discretion when it bases its decision on conflicting evidence, as long as some evidence in the record reasonably supports the trial court's decision." *Id.* As a general rule, "a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

---

[1] Internal quotations and citations are omitted throughout this brief.

## OBJECTION TO MORRISON'S STATEMENT OF FACTS

Anthony and Hilburn object to Morrison's entire statement of facts because it does not comply with TEX. R. APP. P. 38.1(g). The scope of review in this appeal is limited to the record of the temporary injunction hearing. *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 885 (Tex. App. – Dallas 2003, no pet.). Morrison violates this rule by attaching a private investigator's affidavit – which is inadmissible hearsay and outside the record – to its brief as part of its appendix. The affidavit was prepared two months after the hearing and was not filed in the trial court.[2] In its statement of facts, Morrison improperly presents information from the affidavit, which is outside the record.[3] The Court should disregard the affidavit and the parts of Morrison's brief that refer to information in the affidavit. *Zodiac Corp. v. Gen. Elec. Credit Corp.*, 566 S.W.2d 341, 347 (Tex. Civ. App. – Tyler 1978, no writ).

Morrison also improperly presents only part of the evidence from the record of the temporary injunction hearing. In reviewing the trial court's denial of a temporary injunction, the Court must review *all* the evidence in order to "draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment" and to determine if "some evidence in the record reasonably supports the

---

[2] Morrison's Appendix 8.

[3] Morrison's Brief at pg. 10.

3

trial court's decision." *Layton v. Ball*, 396 S.W.3d 747, 753-54 (Tex. App. – Tyler 2013, no pet.). In its brief, Morrison only presents *some* of the evidence – i.e., the self-serving testimony of Morrison's witnesses, which the trial court rejected in denying injunctive relief. As a result, the Court should disregard Morrison's entire statement of facts and consider the following in its place.

## STATEMENT OF FACTS

1. Anthony and Hilburn began their work careers with American Supply.

Mike Anthony went to work for American Supply in Kilgore as a delivery driver in 1978 (2 RR 62). He continued to work in the wholesale plumbing supply business in East Texas for the next thirty-seven years (2 RR 38). Similarly, Scott Hilburn went to work for American Supply in 1981 (3 RR 7). He also continued to work in the wholesale plumbing supply business in East Texas for the next thirty-four years (3 RR 15).

2. Eighteen years later, Morrison acquired American Supply.

Morrison Supply Company took over American Supply in 1996 and Anthony and Hilburn became employees of Morrison (2 RR 38; 3 RR 7). Anthony eventually became the manager of the Kilgore store and Hilburn became the manager of the Tyler branch (2 RR 29).

3. Fifteen years later, Patriot acquired Morrison.

Patriot Supply Holdings, Inc. took over Morrison in 2011 (2 RR 64). Patriot is a privately owned – not a publicly traded – company. Patriot's shareholders are Advent International, previous owners of acquired companies, and participants in its stock plan (3 RR 109). In acquiring Morrison, Patriot planned to improve Morrison's performance and then flip it or take it public (3 RR 110). Patriot owns Morrison and three other "platform" companies (3 RR 128-129). In 2014, Patriot's revenue was about $999,000,000 and Morrison's revenue was about $740,000,000 (3 RR 128). Morrison has between 1,200 and 1,400 employees in Texas, Oklahoma, Louisiana, Kansas, and New Mexico (3 RR 128-129). About 80% of Morrison's stores are in Texas (3 RR 131).

4. Morrison's East Texas employees quickly became dissatisfied with Patriot's new approach to doing business.

When Patriot acquired Morrison, it brought in new executives to run the company, who implemented a different business philosophy (3 RR 58; 4 RR 44). Almost from the onset of Patriot's takeover, store managers became upset about Patriot's business approach (2 RR 75). Before the Patriot takeover, store managers had access to the company's rebate programs with its suppliers, which enabled the store managers to determine the actual costs of products sold, to know the net profits

5

to their branch on products sold, to calculate the commissions payable to their salespeople, and to compete in their local market. After the Patriot takeover, the new executives denied store managers information about the company's rebate programs with its suppliers. As a result, store managers could not determine their actual costs of products sold, could not know the net profits to their branch on products sold, could not calculate the commissions payable to their salespeople, and could not compete in their local market. Patriot's changes made many store managers in East Texas unhappy with the company (2 RR 64-65, 74; 3 RR 20-21, 49-51).

At a meeting attended by several store managers, Mike Anthony had a public disagreement with Morrison's President and proved him wrong on a pricing issue. "We had a pretty heated exchange in front of ... all the rest of the managers," and later several of those managers told him that "we need to do something different." Suppliers who called on him also said he should seek employment elsewhere (2 RR 97).

5. <u>In 2011, the Supreme Court changed the rules for non-compete agreements.</u>

In *Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011), the Supreme Court changed its interpretation of the Covenants Not to Compete Act, TEX. BUS. & COM. CODE § 15.50, from a construction favorable to employees to one favorable to employers. The Court held that an employee's agreement not to solicit the employer's

clients, not to recruit the employer's other employees, and not to disclose confidential information, in exchange for an option to purchase stock in the employer, was an "otherwise enforceable agreement" under the Act. *Id.* at 773. The Court adopted a new rule that "[c]onsideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus ...," abrogating the Court's prior rule in *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (Tex.1994). *Id.* at 775. Applying the new rule, the Supreme Court held the non-compete in that case was enforceable against the employee.

6. <u>A year after the *Marsh* decision, Morrison's top executives asked Anthony and Hilburn to sign a stock option agreement containing a non-compete provision.</u>

The non-compete provision in this case arose out of a meeting in Rockwall, Texas, between Morrison's four top executives, on one side, and Anthony and Hilburn, on the other. At the time of the meeting, Mike Anthony was the store manager for the Kilgore branch, Scott Hilburn was the store manager for the Tyler branch, and together they were co-regional managers over six locations in East Texas and Shreveport (3 RR 15-16). The record contains two dramatically different accounts of what happened at the Rockwall meeting.

7

Anthony and Hilburn both testified that the Chief Operating Officer of Morrison called and told them to come immediately to the company's headquarters in Fort Worth to sign a stock option agreement. They were busy working on their store inventories and asked to postpone the meeting. The Chief Operating Officer then called back, said "[n]o, we have to get this done this week," and told them to meet him at the Morrison branch in Rockwall (2 RR 42-43, 66; 3 RR 40). Anthony and Hilburn drove to Rockwall for the meeting. Chip Hornsby (Chief Executive Officer), Kevin Moore (Chief Operating Officer), Stan Allen (President), and Darrell Hawkins (Past President) were all at the Rockwall branch waiting for them (2 RR 43-44, 67; 3 RR 39-40). Anthony did not know why the four top executives of the company were crowded into the manager's small office in Rockwall to meet with them (2 RR 71).

Chip Hornsby, Morrison's CEO, sat across the desk from Anthony and Hilburn, and slid a document across the desk to them, a document they had never seen before (2 RR 44-45, 68-69; 3 RR 42, 44). The ten-page, single-spaced document was entitled "Nonqualified Stock Option Award Agreement" (2 RR 39; Morrison Ex. 3 and 7). Hornsby explained that "he was giving us stock in the company" and "if the company did well, we would make money" (2 RR 44-45). Hornsby said the stock option was at no risk to them and they would never have to pay anything on the stock,

8

regardless of how the company performed (2 RR 69-70; 3 RR 46-47).

Hornsby said "there was a non-compete clause in this agreement, but that since we were in the State of Texas and that Texas was a right to work state, that [it] was not worth the piece of paper it was written on, [and] that it didn't mean anything in the State of Texas" (2 RR 44, 68-69; 3 RR 36). Hornsby "mentioned that this was a document that he had brought with him from a previous job ..." (2 RR 44). Hornsby's previous job was with a company located in Virginia (2 RR 69). Anthony understood this to mean that "the non-compete part of this document was not in effect in Texas" (2 RR 45). Hornsby also said the non-compete "was only good for 12 months from the day we signed it" (2 RR 45, 69; 3 RR 36, 48). After talking about the non-compete provision, Hornsby said that if they did not want to work for Morrison, he did not want them working there either (3 RR 47). Anthony relied on the representations that Hornsby made to him. He had no reason to mistrust Hornsby, who was the CEO and a major shareholder in Morrison (2 RR 69, 91).

Anthony and Hilburn were given the impression that they had to sign the document on the spot. Anthony testified: "There was a rush to get it signed" (2 RR 48). Hilburn testified that he felt that if he did not sign the agreement he would no longer have a job (3 RR 63). None of the executives indicated they could read the document or take it with them to discuss it with their families or an attorney (2 RR

9

68, 70-71; 3 RR 43-44). No one at the meeting explained to them that the document required them to consent to Delaware law and courts, or that it waived their constitutional right to a jury trial (2 RR 84).

When the Morrison executives gave them the agreement, they did not give Anthony and Hilburn the actual stock option plan incorporated into the agreement (2 RR 41, 82). Anthony and Hilburn had no idea whether the stock options were worth anything and have never received any actual stock under the agreement (2 RR 46; 3 RR 46, 57). Anthony and Hilburn have never been shareholders in Patriot or Morrison (3 RR 139).

Anthony and Hilburn did not read the document before they signed it at the meeting (2 RR 47; 3 RR 33-34, 41-42; Morrison Ex. 3, 7). The entire meeting lasted about 15 minutes (2 RR 84). They had never before signed any written employment agreement – let alone a covenant not to compete – during their thirty-plus years of working in the wholesale plumbing supply business (2 RR 65).

Morrison's CEO, Chip Hornsby, had a significantly different account of what happened at the Rockwall meeting. Hornsby testified that he attended the meeting with Anthony and Hilburn at the Rockwall branch to present them with the opportunity to participate in the stock option plan (3 RR 111-112). But when he met with Anthony and Hilburn, he did not have the agreement with him. He did not shove

it across the table and tell them to sign it. He emailed it to them and the other participants the following morning (3 RR 114). Hornsby testified that Anthony and Hilburn were not required to sign the agreement and there was no reason for them to interpret that they had to participate (3 RR 113). The urgency of the meeting was that Morrison was approaching the end of the year and traditionally did a re-evaluation of shares during the first quarter. The share price was likely going to increase so by signing the agreements by the end of the year, participants could obtain a lower strike price and receive a benefit when the stock value went up (3 RR 114-115).

Hornsby testified that he talked with Anthony and Hilburn about the terms of the agreement: "I drew particular attention as far as to the one-year non-compete date of departure" (3 RR 112). He did not give any opinion to Hilburn and Anthony about the enforceability of the non-compete provision (3 RR 115-116, 122). He told them that they had the opportunity to have a lawyer or financial advisor go over it but they would have to do so at their own expense (3 RR 113-114, 123).

According to Hornsby, the day after the meeting, on December 14, 2012, he emailed the stock option agreement to Anthony and Hilburn (3 RR 119, 123-124; Morrison Ex. 16 and 19). On December 18, 2012, Hilburn emailed his signed version of the stock agreement back to Hornsby (3 RR 124-125; Morrison Ex. 20). On December 19, 2012, Anthony emailed his signed stock option agreement back to

11

Hornsby (3 RR 120; Morrison Ex. 17). Hornsby admitted he never provided the actual stock plan incorporated into the agreement to Anthony or Hilburn (3 RR 135). Without a copy of the stock plan, Anthony and Hilburn had no way to know what they were receiving under the agreement (3 RR 140-141).

7.    <u>About two years after the Rockwall meeting, Anthony and Hilburn talked to the owner of National about going to work for National.</u>

Anthony and Hilburn talked with each other about the general dissatisfaction among store managers at Morrison. Hilburn also talked to his brother, who is his outside salesman, and they "decided that we needed to seek gainful employment elsewhere as we lost trust in the system that we were working in" (3 RR 17-18). In early 2015, Anthony and Hilburn approached the owner of National Wholesale Supply, Inc., another wholesale plumbing supplier, and expressed interest in going to work for National (2 RR 26; 3 RR 16-17, 21). National's owner told them that National would set up new branches in northeast Texas (3 RR 16). National's owner asked if they were subject to a non-compete and they responded that they did not believe the non-compete was in effect (2 RR 80; 3 RR 34-35). The owner's question, however, prompted them to read the 2012 agreement in full for the first time (3 RR 35).

8.     On April 13, 2015, Anthony, Hilburn, and other employees resigned from Morrison.

On the morning of April 13, 2015, Anthony and Hilburn resigned from their employment with Morrison (2 RR 25, 31; 3 RR 8-9; Morrison Ex. 4). Hilburn also received by email 28 or 29 resignation notices of other employees and forwarded them by email to Hornsby (3 RR 26). On April 13, Anthony and Hilburn also filed this lawsuit against Patriot and Morrison for a declaratory judgment regarding the validity of the non-compete and their rights and duties under the stock option agreement (1 CR 1).

9.     National opened up branch locations in East Texas and Shreveport.

On April 13, National opened up a branch in Shreveport under the supervision of Chris Carter, a former Morrison employee who also resigned on April 13, and who attended meetings with National's owner and Anthony while they were still employees of Morrison (2 RR 32). On April 13, National also opened up branches in Kilgore, Longview, and Mt. Pleasant (2 RR 32-33; 3 RR 31-32). The new National branches were staffed with approximately 40 Morrison employees who resigned from Morrison on April 13 (2 RR 33-34). All those people had reported directly or indirectly to Anthony and Hilburn as co-regional managers for Morrison (2 RR 34). Before April 12, National did not have any operations in those towns (2 RR 32).

10.     Anthony and Hilburn were not working for National.

Two weeks after Anthony and Hilburn resigned, on April 27-29, 2015, the trial court held a hearing on Morrison's application for a temporary injunction to enforce the non-compete agreement. Mike Anthony testified he was not currently employed and had never worked for National (2 RR 25). He testified that he intended to go to work for National when the proceeding was resolved (2 RR 25, 37). Scott Hilburn also testified he had never worked for National but intended to go to work for National once the proceeding was resolved (3 RR 12-13, 19).

It is undisputed that Mike Anthony and Scott Hilburn did not take any Morrison property or information, such as a list of customers, when they left (2 RR 83-84). Furthermore, Chip Hornsby, Morrison's CEO, admitted that he did not have any evidence that Anthony and Hilburn had used any confidential information of Morrison after they resigned:

> Q:     Do you have any personal knowledge that Mr. Hilburn or Mr. Anthony has used any of the information that Morrison Supply alleges is confidential?
>
> A.     To my knowledge to date, no.

(3 RR 147-148).

11.  The trial court denied Morrison's application for a temporary injunction.

Two weeks after the hearing, the trial court issued a letter and order denying Morrison's application for a temporary injunction, stating in the order that the "Court finds [Patriot and Morrison] have an adequate remedy at law concerning the claimed issues and the Temporary Injunction should be denied" (CR 191).

## SUMMARY OF THE ARGUMENT

The Court should affirm the trial court. First, Morrison failed to properly challenge the trial court's ruling in its brief. In an appeal of the denial of a temporary injunction, when no findings of fact or conclusions of law are filed, "the trial court judgment must be upheld on any legal theory supported by the record." *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). The trial court did not abuse its discretion if there is any evidence to support an implied finding in support of the order. *Layton v. Ball*, 396 S.W.3d 747, 753-754 (Tex. App. – Tyler 2013, no pet.). Morrison was required to challenge each implied finding that has support in the record by legal and factual sufficiency complaints. See *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-795 (Tex. 2002). Morrison did not do so. As a result, the unchallenged findings bar Morrison's request for a reversal.

15

Second, Morrison did not prove a cause of action for breach of contract, which required proof of four elements. (1) Some evidence exists that the consideration for the stock option agreement was illusory and that the geographic area of the non-compete was unreasonable, which invalidates the agreement. (2) Some evidence exists that Morrison did not perform or tender performance under the stock option agreement. (3) Some evidence exists that Anthony and Hilburn did not breach the agreement. (4) Some evidence also exists that the actions of Anthony and Hilburn – as opposed to the resignations of 38 other employees – did not cause any identifiable damages to Morrison. The trial court could have found that Morrison did not prove one or more of these four elements. There is also some evidence of the defenses of duress, unconscionability, fraudulent inducement, and estoppel. The trial court's order can be upheld on any of these legal theories, which are supported by the record. *Davis*, 571 S.W.2d at 862.

Third, Morrison did not prove a probable right to the relief sought in its pleadings – i.e., temporary and permanent injunctions, damages, and attorney's fees (1 CR 42-44). *Butnaru*, 84 S.W.3d at 204. In light of the conflicting evidence regarding Morrison's breach of contract claim, the trial court did not abuse its discretion in finding that Morrison failed to prove a probable right to the relief sought in its pleadings. The trial court's order can be upheld on the legal theory that

16

Morrison did not prove a probable right to relief, which is supported by the record. *Davis*, 571 S.W.2d at 862.

Fourth, Morrison did not prove that it will suffer a probable, imminent, and irreparable injury in the interim before trial if the court did not issue an injunction. Anthony and Hilburn were not working for National and did not take any Morrison property or information, such as a list of customers, when they left. There is no evidence that Anthony and Hilburn used any confidential information of Morrison after leaving employment. The trial court's order can be upheld on the legal theory that Morrison did not prove it will suffer a probable, imminent, and irreparable injury, which is supported by the record. *Davis*, 571 S.W.2d at 862.

Fifth, the trial court did not abuse its discretion in balancing the equities of the parties and the resulting inconveniences and hardships against Morrison, and in denying an injunction on that basis alone. *Layton v. Ball*, 396 S.W.3d 747, 753 (Tex. App. – Tyler 2013, no pet.).

Finally, Morrison also complains about the trial court's denial of its request to reform the unreasonable geographic scope of the non-compete and then enforce the reformed covenant by a temporary injunction. This complaint is without merit. The Court does not have jurisdiction to review such ruling in this appeal. Morrison does not have a common law or statutory right to reformation before a trial on the merits.

17

Morrison's request for reformation was itself unreasonable. And the trial court did not abuse its discretion in denying the injunction on any one of several grounds other than the geographic scope of the non-compete, so curing that defect by reformation will not entitle Morrison to an injunction anyway.

In summary, the trial court did not abuse its discretion in denying Morrison's application for a temporary injunction.

## **ARGUMENT**

I.      Morrison failed to properly challenge the trial court's ruling in its brief.

A.      In the absence of findings of fact, the Court must uphold the trial court's order on any legal theory supported by the record.

In *Davis v. Huey*, 571 S.W.2d 859 (Tex. 1978), the plaintiffs sued the defendants to enforce certain restrictive covenants in the subdivision where they lived. After a hearing, the trial court denied the plaintiffs' request for a temporary injunction. The plaintiffs appealed the denial to the court of civil appeals, which reversed the trial court. The defendants then appealed to the Supreme Court, which reversed the court of civil appeals. The Supreme Court held that because "no findings of fact or conclusions of law were filed, the trial court judgment must be upheld on any legal theory supported by the record." *Id.* at 862. In a footnote, the Supreme Court recognized that the trial court had issued a letter explaining its ruling, but the

18

Court would not consider the letter:

> A letter from Judge Jones to the attorneys in the case setting forth a basis for his judgment has been submitted as an attachment to the parties' briefs. The letter, however, is not properly made a part of the appellate record and it will not be considered as findings of fact or conclusions of law.

*Id.* at 862 n. 2. The Supreme Court held the trial court did not abuse its discretion in denying a temporary injunction because there was some evidence to support an implied finding by the trial court that the plaintiffs failed to show a probable right to recover and an implied finding that the plaintiffs failed to show irreparable injury. *Id.* at 862-863.

It should be noted that TEX. R. APP. P. 28(c) provides that in appeals of interlocutory orders, "[t]he trial court need not file findings of fact and conclusions of law but may do so within 30 days after the order is signed." This rule has been in place since at least 1997. *Texas Rules of Appellate Procedure*, 60 TEX. B.J. 411, 435 (1997). Despite the language of Rule 28, in an interlocutory appeal of a special appearance ruling in 2002, the Supreme Court again applied the rule in *Davis v. Huey* that when no findings or conclusions are filed, the appellate court must uphold the trial court's order on any legal theory supported by the record:

> If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. Our courts of appeals may review the fact findings for both legal and factual sufficiency....
>
> When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court.

*BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-795 (Tex. 2002).

Likewise, after 1997, the courts of appeals have applied the rule in *Davis v. Huey* that in the absence of findings or conclusions, a trial court's denial of a temporary injunction must be upheld on any legal theory supported by the record.[4] As the Dallas Court has explained, "findings of fact and conclusions of law filed in conjunction with an order on interlocutory appeal may be helpful in determining if the trial court

---

[4] *Lightning Oil Company v. Anadarko E & P Onshore, LLC*, 2014 WL 5463956 (Tex. App.– San Antonio 2014, pet. filed) (not released for publication); *LasikPlus of Texas, P.C. v. Mattioli*, 418 S.W.3d 210, 216 (Tex. App. – Houston [14th Dist.] 2013, no pet.); *Okoro v. Cardenas*, 2013 WL 4820738, at *2 (Tex. App. – Austin 2013, no pet.) (not released for publication); *Wright v. First Nat. Bank of Bastrop*, 2013 WL 1748741, at *3 (Tex. App. – Austin 2013, no pet.) (not released for publication); *James v. Easton*, 368 S.W.3d 799, 805 (Tex. App. – Houston [14th Dist.] 2012, pet. denied); *State v. Elite Med, L.L.C.*, 2011 WL 3610414, at *1 (Tex. App. – San Antonio 2011, no pet.) (not released for publication); *EMS USA, Inc. v. Shary*, 309 S.W.3d 653, 657 (Tex. App.– Houston [14th Dist.] 2010, no pet.); *Anderson Chem. Co. v. Green*, 66 S.W.3d 434, 437 (Tex. App. – Amarillo 2001, no pet.).

exercised its discretion in a reasonable and principled fashion. However, they do not carry the same weight on appeal as findings made under Rule 296, and are not binding when we are reviewing a trial court's exercise of discretion." *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App. – Dallas 2003, no pet.).

Under these authorities, if a reporter's record is filed, and if the court makes *express* findings of fact, the appellant must challenge the findings on legal and factual sufficiency grounds. If the court does not make express findings of fact, the appellant must challenge all *implied* findings on legal and factual sufficiency grounds, and a failure to do so results in the court of appeals upholding the order on any legal theory that has any support in the record.

B.     <u>Morrison did not request – and the trial court did not make – findings of fact and conclusions of law.</u>

Morrison did not file a request for the trial court to make findings of fact and conclusions of law. The trial court, however, issued an explanatory letter (CR 189). In its brief, Morrison treats the letter as though it constitutes formal findings of fact and conclusions of law under TEX. R. CIV. P. 296-299a.[5] As a general rule, a trial court's explanatory letter does not constitute findings of fact and conclusions of law within the meaning of Rules 296-299a. *Cherokee Water Co. v. Gregg Cnty. Appraisal*

---

[5] Morrison's Brief at pg. 17.

*Dist.*, 801 S.W.2d 872, 878 (Tex. 1990) ("the letter, written prior to judgment, is not a finding of fact as contemplated by rules 296-299 ...."). The courts of appeals have followed this rule.[6]

For example, the Texarkana Court has held that when no party files a formal request for findings and conclusions, the court issues an explanatory letter that is filed with the clerk, and the letter does not state it is intended to constitute findings and conclusions, the letter is not treated as findings of fact and conclusions of law. *Moore v. Jet Stream Investments, Ltd.*, 315 S.W.3d 195, 209 (Tex. App. – Texarkana 2010, pet. denied).

This Court, however, has recognized that "[i]t is possible for findings and conclusions to be contained in a trial court's letter to counsel if the letter is filed of record." *In re Estate of Miller*, 446 S.W.3d 445, 450 (Tex. App. – Tyler 2014, no pet.). In *Miller*, the appellant filed a formal request for findings of fact and conclusions of law; filed a notice of late findings and conclusions; the trial court's letter had the same date as the court's order; the letter referenced the order; the letter

---

[6] *Woods v. Communities in Sch. Se. Texas*, 2015 WL 2414260, at *5 (Tex. App. – Beaumont 2015, no pet.) (not released for publication); *Holt v. Kelso*, 2014 WL 858345, at *3 (Tex. App. – Austin 2014, no pet.); *Protect Environmental Services, Inc. v. Norco Corp.*, 403 S.W.3d 532 (Tex. App. – El Paso 2013, pet. denied); *Burgess v. Denton Cnty.*, 359 S.W.3d 351, 359 (Tex. App.– Fort Worth 2012, no pet.); *Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*, 375 S.W.3d 464, 482 n. 24 (Tex. App. – Austin 2012, pet. denied); *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 883 (Tex. App. – Dallas 2009, no pet.); *Summers v. Fort Crockett Hotel, Ltd.*, 902 S.W.2d 20, 25 (Tex. App. – Houston [1st Dist.] 1995, writ denied).

and order were filed of record on the same date; and the letter contained specific factual findings and cited controlling authority. *Id.* at 450-452. The Court held that in that situation, the letter constituted formal findings of fact and conclusions of law. *Id.* at 452.

*In re Estate of Miller* should not apply here because –

- Morrison did not request findings and conclusions;

- the letter is not file-marked (although it is part of the clerk's record);

- the letter does not express an intent that it constitutes formal findings and conclusions;

- the letter does not make unequivocal findings – e.g., it says the agreement "does not appear to be illusory (based upon the evidence presented thus far);" and

- the letter does not contain the factual finding expressed in the order itself that the "Court finds that [Patriot and Morrison] have an adequate remedy at law concerning the claimed issues ..." (CR 191).

C.    The Court should affirm because in its brief, Morrison did not challenge every implied finding that could support the trial court's order.

For the reasons discussed above, the Court should not treat the trial court's explanatory letter as formal findings of fact and conclusions of law. Consequently, Morrison was required to challenge each implied finding that has support in the record by legal and factual sufficiency complaints. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-795 (Tex. 2002). Because Morrison failed to do

so in its brief, the Court must uphold the trial court's denial of the temporary injunction on any legal theory supported by any evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). In *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 283 (Tex. Civ. App. – Tyler 1981, no writ), this Court applied the rule that without findings of fact and conclusions of law, "the appellate court must affirm the judgment rendered by the trial court if it can be upheld on any legal theory supported by the record." *Id.* In *Sills*, the Court affirmed because some evidence supported a legal basis for the trial court's denial of the application for a temporary injunction. *Id.* As demonstrated below, the trial court did not abuse its discretion in denying Morrison's application for a temporary injunction because some evidence supports at least one legal basis for such denial.

## II. Morrison was required to prove four elements to obtain a temporary injunction.

The common law rules applicable to temporary injunctions govern whether a trial court properly denied a former employer's application for a temporary injunction to enforce a non-compete agreement. *EMS USA, Inc. v. Shary*, 309 S.W.3d 653, 657 (Tex. App. – Houston [14th Dist.] 2010, no pet.). To obtain a temporary injunction, Morrison was required to prove four factual elements. If any evidence supports the trial court's implied finding that Morrison did not establish any of those elements, the trial court did not abuse its discretion. *Layton v. Ball*, 396 S.W.3d 747, 753 (Tex.

24

App. – Tyler 2013, no pet.). If "there is any evidence to support the trial court's ruling then the court did not abuse its discretion." *Perry Homes v. Cull*, 258 S.W.3d 580, 602 (Tex. 2008).

First, Morrison was required to plead and prove a cause of action against Anthony and Hilburn. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Morrison plead two causes of action: breach of contract and breach of fiduciary duty (CR 38-39). In its brief, Morrison did not present any facts or argument regarding a claim for breach of fiduciary duty, but instead presented only its claim for breach of contract.[7] The "elements of a breach of contract action are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.*, 260 S.W.3d 529, 536 (Tex. App. – Tyler 2008, pet. denied).

Second, Morrison was required to plead and prove a probable right to the relief sought in its pleadings – i.e., temporary and permanent injunctions, damages, and attorney's fees (1 CR 42-44). *Butnaru*, 84 S.W.3d at 204.

Third, Morrison was required to plead and prove that it will suffer a probable, imminent, and irreparable injury in the interim before trial if the court did not enjoin

---

[7] Morrison's Brief at pg. 16.

25

Anthony and Hilburn. *Butnaru*, 84 S.W.3d at 204.

And fourth, Morrison was required to demonstrate that the balancing of the equities between the parties entitles it the equitable relief of an injunction. "In determining whether to order a temporary injunction, the trial court balances the equities of the parties and the resulting conveniences and hardships." *Layton v. Ball*, 396 S.W.3d 747, 753 (Tex. App. – Tyler 2013, no pet.).

The following sections address each of the four factual elements Morrison was required to establish in order to obtain a temporary injunction.

III. <u>Morrison did not prove at least one element of its cause of action against Anthony and Hilburn for breach of the stock option agreement.</u>

A. <u>Morrison did not prove the existence of a valid contract.</u>

1. <u>Consideration</u>

In its letter to the attorneys, the trial court stated:

> The Court finds that the "Patriot Supply Holdings, Inc. 2012 Stock Option Plan-Nonqualified Stock Option Award Agreement" signed by Anthony and Hilburn does not appear to be illusory (based upon the evidence presented thus far).

> The Court finds Paragraphs 7, 8 and 9 to be ancillary to an otherwise enforceable agreement - the said Agreement as same is contained within the "Patriot Supply Holdings, Inc. 2012 Stock Option Plan - Nonqualified Stock Option Award Agreement" (as required by <u>Marsh</u>).

26

(CR 189).

As explained above, the Court should not give these statements the effect of formal findings of fact and conclusions of law. Instead, the Court should uphold the trial court's denial of the temporary injunction on the ground that no valid contract exists between the parties, which is a legal theory supported by some evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 283 (Tex. Civ. App. – Tyler 1981, no writ). If the Court gives the trial court's statements the effect of formal findings and conclusions, however, then Anthony and Hilburn challenge the legal and factual sufficiency of the evidence to support such fact findings, and the correctness of such legal conclusions, for the following reasons.

The first element of a breach of contract claim is "the existence of a valid contract." *Acad. of Skills & Knowledge, Inc.*, 260 S.W.3d at 536. To be enforceable, a non-compete must be "ancillary to or part of an otherwise enforceable agreement at the time that the agreement is made." TEX. BUS. & COM. CODE § 15.50. Morrison was required to prove that consideration existed for the non-compete. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011). Knowledge of a unique customer base and of the products used by each of the employer's customers can constitute protectable interests. *Stone v. Griffin Comm. & Security Systems, Inc.*, 53 S.W.3d 687, 694 (Tex. App. – Tyler 2001, no pet.). But Morrison had to prove it provided confidential

27

information to Anthony and Hilburn *after* they signed the stock option agreement in December 2012. *Digital Generation, Inc. v. Boring,* 2012 WL 1413386 at *10 (N.D. Tex. 2012). Morrison did not do so. Anthony and Hilburn had worked in the wholesale plumbing supply business in East Texas for more than thirty years and acquired substantial knowledge about customers, products, and pricing *before* they signed the stock option agreement.

As to customers, it is undisputed that customers purchase from multiple wholesale distributors, and each wholesale distributor would have the same information regarding customers (2 RR 23; 3 RR 148). The identity of plumbers, HVAC contractors, builders, and other customers can be learned easily from public information on the internet (2 RR 77; 3 RR 57).

As to products, Morrison, National, and their others in the plumbing supply business all go to the same manufacturers to buy products (2 RR 72). In fact, Morrison and National are in the same buying group. The prices negotiated between their buying group and manufacturers are available equally to Morrison and National as members of the same buying group (2 RR 20-21; 3 RR 50-51).

As to pricing, Morrison did not prove it provided any confidential information about prices with its manufacturers or customers to Anthony and Hilburn. Regarding manufacturers, Morrison was a member of a buying group, and the prices negotiated

28

by the buying group with manufactures was not confidential because Morrison, National, and other competitors are members of the same buying group (2 RR 20-21; 3 RR 50-51). There are no trade secrets regarding the manufacturer's prices for products (2 RR 72-73). After Patriot took over Morrison, the new executives denied Anthony and Hilburn information about the company's rebate programs and negotiated price discounts with its suppliers. Consequently, they could no longer determine the actual prices that Morrison paid to its suppliers and manufacturers (2 RR 64-65, 73-74, 90; 3 RR 20-21, 49-51; 4 RR 21). Anthony and Hilburn testified that after the Patriot takeover, they did not have access to any proprietary, confidential, or trade secret information of Morrison (2 RR 71; 3 RR 53-54).

Regarding customer pricing, Morrison maintains a database classifying customers for prices on thousands of products, but any employee of Morrison can look up the pricing classification of any customer at any time (2 RR 53-54). Anthony and Hilburn would periodically get an email from Morrison's headquarters that identified the floor price on four product lines – PVC fittings, PVC pipe, copper pipe, and copper fittings – below which they could not sell the product without getting additional approval. Although the emails would be password protected, Morrison never indicated the information was confidential, and in fact encouraged Anthony and Hilburn to share the information with the outside sales staff and other branch

29

managers who had never signed any kind of non-compete (3 RR 55-58; 4 RR 24-25).

Furthermore, it is undisputed that the prices that Morrison pays its suppliers, and the prices Morrison charges its customers, frequently change (2 RR 88). Prices change daily, weekly, and monthly. The pricing information in effect when Anthony and Hilburn left Morrison has likely already changed since they resigned (2 RR 92). Morrison's only password protected pricing "would change daily" and was "definitely not the same" at the time of the hearing as on the date of their resignations (3 RR 55-56; 4 RR 13, 22).

Regarding any other company information about Morrison, the other store managers who left Morrison had access to the same company information at Morrison as Anthony and Hilburn, but none of them signed non-competes (2 RR 75). Hornsby, Morrison's CEO, admitted that Morrison does not have any procedure in place to protect what is claimed to be confidential information, other than some emails that are password protected (3 RR 143).

The stock option agreements contain a boilerplate provision about the "Participant" having access to confidential information of the "Company," which is defined as Patriot, not Morrison (Morrison Ex. 3 and 7 at par. 7). Recitations in the contract containing a non-compete provision alone are not sufficient to prove the grounds for a temporary injunction. *See W.R. Grace & Co. - Conn v. Taylor*, 2007

30

WL 1438544, at *2, n. 7 (Tex. App. [Houston 14th Dist.] 2007, no pet.) (not released for publication); *Sec. Telecom Corp. v. Meziere*, 1996 WL 87212, at *2 (Tex. App. – Dallas 1996, no pet.) (not released for publication). There is no evidence that Patriot ever provided any of its confidential information to Anthony and Hilburn.

A stock option can support an agreement not to compete. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 774-776 (Tex. 2011). Patriot's stock option agreement, however, is nothing more than a lawyer's clever attempt to create an enforceable non-compete without providing anything of value to the employee. Unlike the situation in *Marsh*, Anthony and Hilburn have never received any stock under the agreement (3 RR 138-139). Each agreement purports to grant an "option" to Anthony and Hilburn to "purchase" 50 shares of Patriot's stock for $1,130.00 (Morrison Ex. 3 and 7 at par. 1). In reality, Anthony and Hilburn cannot purchase any stock in Patriot. Instead, if and when Patriot decides to flip Morrison to another company or take Morrison public, they would get the difference in value between the price stated in the agreement and the sales price set by Patriot, if they were still employees at the time of the sale and satisfied all other requirements of the agreement (3 RR 132, 137). Thus, Patriot had complete control over whether Anthony and Hilburn could ever receive anything of value under the agreement.

Hornsby never provided the actual stock plan incorporated into the agreement

to Anthony or Hilburn. Without the stock plan, Anthony and Hilburn had no way to know what they were receiving under the agreement (3 RR 135, 140-141). If Hornsby had given them the actual stock plan, they would have learned that under the plan's fine print, Patriot had the right to "amend, suspend, discontinue or terminate this Plan or ... any Award (or Award Agreement) hereunder at any time ..." (Morrison's Ex. 13 at par. 12.2). This makes any consideration in the agreement illusory. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 236 (Tex. 2003) (employer's right to unilaterally abolish or modify any personnel policy made consideration illusory for arbitration clause in policy).

Anthony and Hilburn were at-will employees of Morrison. Under the stock option agreement, if Morrison terminated their employment for "cause," they forfeited all rights under the agreement (Morrison Ex. 3 and 7 at par. 3.a.). The stock plan defined "cause" so broadly that Morrison could terminate them for virtually any reason and thereby forfeit their rights under the agreement (Morrison Ex. 13 at par. 2.6). Thus, any consideration to Anthony and Hilburn under the stock option agreement was illusory. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 660-661 (Tex. 2006) (Chief Justice Jefferson, joined by Justice O'Neill and Justice Medina, concurring) ("At-will employment renders many promises illusory because the promisor effectively retains the option of discontinuing

32

employment in lieu of performance. Because an illusory promise does not constitute consideration, an agreement based on an illusory promise is not an 'otherwise enforceable' agreement" under the Act.).

In short, the Court should affirm because the trial court's denial of the temporary injunction can be upheld on the legal theory of lack of consideration for the non-compete and some evidence supports that theory.

## 2. Reasonable Limitations

To be enforceable, a non-compete must also contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and that do not impose a greater restraint than is necessary to protect" the company's goodwill or other business interests. TEX. BUS. & COM. CODE § 15.50. The non-compete provision in the stock option agreement provides that "during the period of the Participant's employment with the Company or its Affiliates and for one (1) year thereafter ... the Participant shall not engage, directly or indirectly in the Business anywhere in the United States ..." (Morrison Ex. 3 and 7 at par. 8). "Business" is defined as "the business of the Company [Patriot] and its Subsidiaries as currently conducted on the date hereof, as conducted within the five (5) years prior to the date hereof or which the Board has authorized the Company to develop or pursue (by acquisition or otherwise)" (Morrison Ex. 3 and 7 at par. 17.b.).

33

The trial court stated in its letter to the attorneys:

> The Court finds the agreement to be overbroad – as was impliedly admitted by the Defendants (at least as to geographic scope). The Court was not persuaded (at this point) that the Court should reform the agreement pending a final trial after appropriate discovery.

(CR 189).

It is undisputed that Anthony and Hilburn's work for Morrison only involved the branches in East Texas and Shreveport (3 RR 15-16). There is no evidence that Anthony and Hilburn ever performed services for Morrison throughout the United States. Clearly, the limitation as to geographic area is not reasonable, and for that reason alone, the trial court properly denied Morrison's application for a temporary injunction. A non-compete extending to any area where the employer may be operating or carrying on business is unenforceable. *Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950, 952 (Tex. 1960) ("the restrictive covenant must bear some relation to the activities of the employee. It must not restrain his activities in a territory into which his former work has not taken him or given him the opportunity to enjoy undue advantages in later competition with his employer"); *Posey v. Monier Res., Inc.*, 768 S.W.2d 915, 919 (Tex. App. – San Antonio 1989, writ denied) (holding that covenant that extended to entire United States was overbroad when former employee only worked in part of Texas).

In summary, the Court should affirm because the trial court's denial of the temporary injunction can be upheld on the legal theory of unreasonable geographic scope and some evidence supports that theory.

B.  Alternatively, Morrison did not prove that it performed or tendered performance.

The second element of a breach of contract action is "performance or tendered performance by the plaintiff." *Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.*, 260 S.W.3d 529, 536 (Tex. App. – Tyler 2008, pet. denied). As explained above, the evidence is conflicting as to whether Morrison gave any consideration to Anthony and Hilburn in connection with the stock option agreement. Consequently, the Court should uphold the trial court's denial of the temporary injunction on the ground that Morrison did not perform or tender performance, which is a legal theory supported by some evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 283 (Tex. Civ. App. – Tyler 1981, no writ).

C.  Alternatively, Morrison did not prove that Anthony and Hilburn breached the agreement.

The third element of Morrison's contract claim is "breach of the contract by the defendant." *Acad. of Skills & Knowledge, Inc.*, 260 S.W.3d at 536. Mike Anthony testified he was not currently employed and has never worked for National (2 RR 25). Scott Hilburn also testified he has never worked for National but intended to go to

35

work for National once the proceeding was resolved (3 RR 12-13, 19). It is undisputed that Mike Anthony and Scott Hilburn did not take any Morrison property or information, such as a list of customers, when they left (2 RR 83-84). Morrison's CEO admitted that he did not have any evidence that Anthony and Hilburn had used any confidential information of Morrison after leaving employment (3 RR 147-148). Witnesses testified that Hilburn and Anthony did not recruit any employees to leave Morrison and go to work for National (3 RR 23, 53, 63; 4 RR 43). The Court should uphold the trial court's denial of the temporary injunction on the ground that Morrison did not prove a breach of the stock option agreement, which is a legal theory supported by some evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 283 (Tex. Civ. App. – Tyler 1981, no writ).

D.     Alternatively, Morrison did not prove that Anthony and Hilburn caused damages to Morrison.

The fourth element of a breach of contract action is proof of "damages sustained by the plaintiff as a result of the breach." *Acad. of Skills & Knowledge, Inc.*, 260 S.W.3d at 536. Morrison did not offer any evidence that the actions of Anthony and Hilburn – as opposed to the resignations of 38 other employees – caused any identifiable damages to Morrison. The Court should uphold the trial court's denial of the temporary injunction on the ground that Morrison did not prove that Anthony and

36

Hilburn caused any damages to Morrison, which is a legal theory supported by some evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 283 (Tex. Civ. App. – Tyler 1981, no writ).

E.      Alternatively, some evidence supports one or more of Anthony and Hilburn's defenses to Morrison's contract claim.

As discussed above, Anthony and Hilburn testified that –

•       Hornsby represented "he was giving us stock in the company" (2 RR 44-45), when in fact the agreement is only an illusory "stock option;"

•       Hornsby said the non-compete clause "was not worth the piece of paper it was written on" (2 RR 44, 68-69; 3 RR 36), contrary to the position Morrison is taking in this case;

•       Hornsby said the non-compete "was only good for 12 months from the day we signed it" (2 RR 45, 69; 3 RR 36, 48), contrary to the position Morrison is taking in this case;

•       the Morrison executives never gave them the actual stock plan incorporated into the agreement, which was necessary to understand the agreement (2 RR 41, 82); and

•       Anthony and Hilburn were pressured into signing the agreement (2 RR 48; 3 RR 63).

37

This is some evidence of the defenses of duress,[8] unconscionability,[9] fraudulent inducement,[10] and estoppel.[11] The Court should uphold the trial court's denial of the temporary injunction on one or more of these defenses, which are supported by some evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 283 (Tex. Civ. App. – Tyler 1981, no writ).

IV.    Morrison did not prove it had a probable right to the relief it requested.

Morrison was also required to plead and prove a probable right to the relief sought in its pleadings – i.e., temporary and permanent injunctions, damages, and attorney's fees (1 CR 42-44). *Butnaru*, 84 S.W.3d at 204. In light of the conflicting evidence regarding consideration and the unreasonableness of the geographic scope of the non-compete, the trial court did not abuse its discretion in finding that Morrison failed to prove a probable right to the relief sought in its pleadings.

---

[8] *Gooch v. American Sling Co.*, 902 S.W.2d 181, 186 (Tex. App. – Fort Worth 1995, no writ).

[9] *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex.2008).

[10] *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex.2001).

[11] *Johnson & Higgins v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-516 (Tex.1998).

V.    Morrison did not prove it will suffer a probable, imminent, and irreparable injury without a temporary injunction.

Morrison was required to plead and prove that it will suffer a probable, imminent, and irreparable injury in the interim before trial if the court did not enjoin Anthony and Hilburn. *Butnaru*, 84 S.W.3d at 204. Morrison did not offer any proof that any injury was *imminent*. Anthony and Hilburn were not working for National (2 RR 25, 3 RR 12-13, 19). They did not take any Morrison property or information, such as a list of customers, when they left (2 RR 83-84). Morrison had no evidence that Anthony and Hilburn had used any confidential information of Morrison after leaving employment (3 RR 147-148). Morrison's fear and apprehension that Anthony and Hilburn might in the future violate the terms of the non-compete were not enough to obtain the extraordinary remedy of a temporary injunction. *Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246, 248 (Tex.1983).

Likewise, Morrison did not offer any proof that any injury was *irreparable*. "The showing of irreparable harm requires proof that the injury is of such a nature that the injured party cannot be adequately compensated for it in damages." *Haq v. America's Favorite Chicken Co.*, 921 S.W.2d 728, 730 (Tex. App. – Corpus Christi 1996, writ dism'd). An *irreparable* injury requires proof of damages other than lost profits or other damages recoverable for breach of contract. *Id.* Morrison did not

39

prove the absence of an adequate remedy at law in the form of damages as required to obtain injunctive relief. *McGlothlin v. Kliebert*, 672 S.W.2d 231, 232 (Tex. 1984). The trial court did not abuse its discretion in finding that Morrison failed to prove it will suffer a probable, imminent, and irreparable injury without a temporary injunction.

VI.  Morrison did not prove that a balancing of the equities entitles it to equitable relief.

Morrison was also required to demonstrate that the balancing of the equities between the parties entitles it the equitable relief of an injunction. "In determining whether to order a temporary injunction, the trial court balances the equities of the parties and the resulting conveniences and hardships." *Layton v. Ball*, 396 S.W.3d 747, 753 (Tex. App. – Tyler 2013, no pet.). "As part of its weighing of the equities, a court considering a temporary injunction under the [Covenant Not to Compete Act] may balance the probable harm to the [former employer] if a temporary injunction is erroneously denied with the probable harm to the [former employee] if a temporary injunction is erroneously granted." *NMTC Corp. v. Conarroe*, 99 S.W.3d 865, 868 (Tex. App. - Beaumont 2003, no pet.).

On one side of the balancing, Anthony and Hilburn needed to go back to work to support their families because they did not have regular sources of income other

than through employment (2 RR 83; 3 RR 59). Anthony and Hilburn had each worked for more than thirty years in the wholesale plumbing supply business in East Texas – and had acquired knowledge, experience, reputations, and customer relationships – before they ever signed Patriot's stock option agreement. They had each worked at the same desk, in the same office, doing the same simple job for decades before they resigned (2 RR 63; 3 RR 60, 4 RR 34-35). Morrison never provided any specialized training to them and their jobs did not require any kind of specialized training (3 RR 60).

In the wholesale supply business, customers purchase from multiple wholesale distributors; each distributor has the same information regarding customers; and any distributor can easily obtain the identity of customers by internet searches for plumbers, HVAC contractors, builders, and other customers in the market (2 RR 23, 77; 3 RR 57, 148). Morrison, National, and their competitors all buy from the same manufacturers and are in the same buying group with access to the same negotiated prices with manufacturers (2 RR 20-21, 72; 3 RR 50-51). To the extent Morrison was able to negotiate a different price with a manufacturer, Morrison denied that information from Anthony and Hilburn along with any other proprietary, confidential, or trade secret information (2 RR 64-65, 71-74, 90; 3 RR 20-21, 49-54; 4 RR 21). Morrison only password-protected the customer pricing information as to four of its

hundreds of products for sale; that information "would change daily" and was "definitely not the same" at the time of the hearing as on the date of their resignations (2 RR 92 3 RR 55-56; 4 RR 13, 22).

On the other side of the balancing, Patriot's revenue was about $999,000,000 and Morrison's revenue was about $740,000,000 in 2014 (3 RR 128). The trial court heard evidence that Morrison acted unfairly in obtaining the non-compete covenants through the stock option agreement at the meeting in Rockwall. There was evidence that the consideration for the non-compete was illusory. Although Morrison claimed it gave Anthony and Hilburn access to "confidential" information, in reality it shared the same information with many employees who never signed any kind of non-disclosure or non-compete agreement (2 RR 75; 3 RR 93). Morrison did not have any plan or procedure in place to protect information it claimed was confidential, other than to password-protect customer prices on four types of products (3 RR 92, 143). Morrison could fire Anthony and Hilburn at any time for "cause" and thereby forfeit any rights they had under the stock option agreement. Patriot drafted the non-compete with a geographic area – the entire United States instead of where Anthony and Hilburn had worked – that Texas courts had deemed overbroad for more than fifty years. *Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950, 952 (Tex. 1960).

The trial court could have reasonably inferred that Morrison's real motive in seeking a temporary injunction was to deprive Anthony and Hilburn of the ability to earn a living and to punish them. The court heard evidence of a situation in Lufkin that occurred while Anthony and Hilburn still worked for Morrison. When the manager for the Lufkin store resigned, Morrison filed a retaliatory lawsuit and sought a temporary injunction against him, even though he had never signed a non-compete agreement. Morrison's President told Anthony that Morrison knew it did not have "any solid ground to stand on in Lufkin, but that they would tie the manager up in court 'long enough to bankrupt his ass'" (2 RR 81-82).

In short, in determining whether to order a temporary injunction, the trial court did not abuse its discretion in balancing the equities of the parties and the resulting inconveniences and hardships against Morrison. *Layton v. Ball*, 396 S.W.3d 747, 753 (Tex. App. – Tyler 2013, no pet.).

VII.   Morrison's complaint about reformation of the non-compete is without merit.

   A.   The Court does not have jurisdiction to consider this complaint.

Morrison also complains that the trial court abused its discretion in refusing to reform the non-compete provision of the stock option agreement before trial and then enforce the reformed non-compete by a temporary injunction.[12] The Court does not

---

[12] Morrison's Brief at pg. 44.

have jurisdiction to consider this issue in this appeal of the denial of a temporary injunction. An identical situation was presented in *McNeilus Companies, Inc. v. Sams*, 971 S.W.2d 507 (Tex. App. – Dallas 1997, no pet.). The trial court denied the former employer's application for a temporary injunction on the ground the non-competition agreement was unreasonably broad and denied the former employer's request to reform the agreement. On appeal, the former employer complained about the trial court's refusal to reform the non-compete and then enforce the reformed covenant by a temporary injunction. The Dallas Court held the statute authorizing an interlocutory appeal of a grant or denial of a temporary injunction, TEX. CIV. PRAC. & REM. CODE § 51.014, did not authorize an interlocutory appeal of a denial of a motion to reform a non-compete to make it enforceable. The Dallas Court held:

> We are not aware of any statutory provision authorizing an appeal from an interlocutory order denying a motion to reform a covenant not to compete. An appeal from an interlocutory order in an injunction case may not be used as a vehicle for appellate court review of other non-appealable interlocutory orders. We hold that a trial court's refusal to reform the agreement is not appealable at this interlocutory stage; accordingly, [the former employer's] second point of error is dismissed for want of jurisdiction.

*Id.* at 511. *Accord, Sadler Clinic Ass'n, P.A. v. Hart*, 2010 WL 114241, at *3 (Tex. App. – Beaumont 2010, no pet.) (not released for publication). The Tyler Court also follows the principle that an authorized appeal from an interlocutory order cannot be

44

used as a vehicle for appellate review of a non-appealable interlocutory order. *Edmonds v. Gray*, 2008 WL 541673 (Tex. App. – Tyler 2008, no pet.) (not released for publication); *In re Guardianship of Humphrey*, 2008 WL 2445503 (Tex. App. – Tyler 2008, pet. denied) (not released for publication). Consequently, the Court does not have jurisdiction to review the trial court's interlocutory order denying Morrison's motion to reform the non-compete.

B. <u>Alternatively, Morrison does not have a common law or statutory right to reformation before a trial on the merits.</u>

Assuming the Court has jurisdiction to consider Morrison's complaint, the trial court did not abuse its discretion because Morrison does not have a right to reformation at this stage of the case. At common law, the remedy of reformation of a contract is not available without a trial on the merits. A party is entitled to a trial by jury on all factual issues required to obtain the common law remedy of reformation. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379-380 (Tex. 1987); *Olney Sav. & Loan Ass'n v. Farmers Mkt. of Odessa, Inc.*, 764 S.W.2d 869, 872 (Tex. App. – El Paso 1989, writ denied). An action for reformation requires an adjudication of the merits of the case, which is not possible in a temporary injunction hearing. In *Sadler Clinic Ass'n, P.A. v. Hart*, 2010 WL 114241, at *3 (Tex. App. – Beaumont 2010, no pet.) (not released for publication), the Beaumont Court declined to consider

45

the appellant's request to reform the geographic scope of a non-compete, holding that "[b]ecause we need not determine the merits of the noncompete agreement in this interlocutory appeal, we do not reform the agreement in this appeal." *Id.* The "underlying merits" of the controversy cannot be adjudicated in a temporary injunction hearing. *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 882 (Tex. App. – Dallas 2003, no pet). There is no common law remedy to reform a contract before trial through a temporary injunction. *See LasikPlus of Texas, P.C. v. Mattioli*, 418 S.W.3d 210, 221 (Tex. App. – Houston [14th Dist.] 2013, no pet.).

Likewise, the Covenants Not to Compete Act does not provide for interim reformation of an overbroad covenant. The Act states that if the non-compete contains an unreasonable geographic area that imposes a greater restraint than necessary to protect the interests of the former employer, then –

> the court shall reform the covenant to the extent necessary to cause the [limitation] contained in the covenant as to ... geographical area ... to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the [former employer] and enforce the covenant as reformed, except that the court may not award the [former employer] damages for a breach of the covenant before its reformation and the relief granted to the [former employer] shall be limited to injunctive relief.

46

TEX. BUS. & COM. CODE § 15.51(c). The Act also provides that it preempts common law remedies and provides the exclusive remedies for enforcement of a non-compete. *Id.* 15.52.

Construing these sections, the Houston First Court held that the Act does not allow a trial court to reform an overbroad non-compete before trial and then enforce the reformed covenant by a temporary injunction. *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 238 (Tex. App. – Houston [1st Dist.] 2003, no pet.). Reformation under the Act is a final remedy, which is not available before trial. *Id.* The Houston First Court recently re-affirmed this rule, stating: "Reformation pursuant to section 15.51 is a remedy to be granted at a final hearing, whether on the merits or by summary judgment, not as interim relief." *Sentinel Integrity Solutions, Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 921 (Tex. App. – Houston [1st Dist.] 2013), pet. denied). The Waco Court follows the same rule. *Gray Wireline Serv., Inc. v. Cavanna*, 374 S.W.3d 464, 470 (Tex. App. – Waco 2011, no pet.).

Morrison argues that "any overbreadth in the agreement's restrictions does not bar injunctive relief, citing two cases.[13] The first case, *Tranter, Inc. v. Liss*, 2014 WL 1257278 (Tex. App. Fort Worth 2014, no pet.) (not released for publication), reversed and remanded the trial court's denial of an injunction to enforce a non-compete.

_____

[13] Morrison's Brief at pg. 22.

47

Disagreeing with the view of the Houston First and Waco Courts, the Fort Worth Court ruled that on remand the trial court could reform the overbroad non-compete and enforce the reformed covenant by a temporary injunction. *Id.* The second case, *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 756 (S.D. Tex. 2009), noted that Texas law is unsettled as to whether a court can reform a covenant before trial but did so anyway. Neither case has precedential value. These opinions are wrong because there is no common law or statutory remedy of reformation before a trial on the merits.

C.    <u>Alternatively, Morrison's request for reformation was itself unreasonable.</u>

The trial court did not abuse its discretion in denying Morrison's request to reform the non-compete because Morrison's proposed modification was itself illegal. Morrison asked the court to enjoin Anthony and Hilburn from "being employed by ... or otherwise participating in the business of National or any other competitor of Morrison and competing, directly or indirectly, with Morrison" in nine Texas counties and one Louisiana parish (CR 42). This type of industry-wide bar is unreasonable and overbroad because it is goes beyond prohibiting them from dealing with customers of Morrison. "A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee." *Wright v. Sport Supply Grp., Inc.*,

48

137 S.W.3d 289, 298 (Tex. App. – Beaumont 2004, no pet.). "A covenant not to compete that contains an industry-wide exclusion from subsequent employment is unenforceable. Further, a covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable." *Id.* Morrison also requested the reformed covenant to bar them from working in two counties (Morris and Grayson) (CR 42), where Morrison admits they had no responsibilities as regional co-managers.[14] The trial court did not abuse its discretion in denying Morrison's motion to reform the non-compete because Morrison's proposed reformation was itself illegal.

D. <u>Alternatively, Morrison cannot obtain a temporary injunction to enforce a reformed non-compete without establishing the grounds for a temporary injunction.</u>

The Court should not reach the issue of reformation unless the Court first determines that the trial court abused its discretion in denying Morrison's application for a temporary injunction. The overbroad geographic scope of the non-compete is only one of many defects in Morrison's claim for a temporary injunction, as demonstrated above. Reforming the geographic area of the covenant will not overcome the other valid grounds for the trial court's denial of injunctive relief set forth above.

---

[14] Morrison's Brief at pg. 1.

In summary, the Court does not have jurisdiction to review Morrison's complaint regarding the trial court's denial of its request for a reformation of the non-compete. Regardless, the trial court did not abuse its discretion because Morrison does not have a right to the remedy of reformation before a trial on the merits, Morrison's request for reformation was itself unreasonable, and the trial court did not abuse its discretion in denying Morrison's application for temporary injunction on other grounds.

## PRAYER

For these reasons, Anthony and Hilburn request the Court to affirm the decision of the trial court and order Morrison to pay all costs of court. They also request the general and special relief at law or in equity they are entitled to receive.

Respectfully submitted,

M. KEITH DOLLAHITE, P.C.
5457 Donnybrook Avenue
Tyler, Texas 75703
(903) 581-2110
(903) 581-2113 (Facsimile)
keith@mkdlaw.us

/s/ Keith Dollahite
By:_____
M. Keith Dollahite
State Bar No. 05958550

Trey Yarbrough
State Bar No. 22133500
Dallas W. Tharpe
State Bar No. 24052036
YARBROUGH WILCOX, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
(903) 595-3111
trey@yw-lawfirm.com
dallas@yw-lawfirm.com

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4(i)(3), I certify that this document contains 11,537 words based on the word count of the computer program used to prepare the document, excluding the sections not counted under TEX. R. APP. P. 9.4(i)(1), which is below the maximum of 15,000 words in TEX. R. APP. P. 9.4(i)(2).

/s/ Keith Dollahite

_____

## CERTIFICATE OF SERVICE

The foregoing document was filed and served electronically upon Michael E. Starr, 1127 Judson Road, Suite 211, Longview, Texas 75606, mstarr@ccfww.com and Vanessa Griffith, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201, vgriffith@velaw.com, on July 24, 2015.

/s/ Keith Dollahite

_____

© 2015 M. Keith Dollahite, P.C.  All rights reserved.